730 N.W.2d 604 (2007)
2007 ND 62
In the Interest of D.M., a child.
Ruby Knoll, L.S.W. on behalf of Cass County Social Services, Petitioner and Appellee,
v.
D.M., a child, D.D., Father, Respondents, and
L.M., Mother, Respondent and Appellant.
No. 20060236.
Supreme Court of North Dakota.
May 1, 2007.
*605 Constance L. Cleveland, Assistant State's Attorney, Fargo, N.D., for petitioner and appellee.
L. Patrick O'Day, Fargo, N.D., for respondent and appellant.
*606 SANDSTROM, Justice.
[¶ 1] L.M. appeals the juvenile court order terminating her parental rights to D.M. Concluding the juvenile court did not err in terminating L.M.'s parental rights, we affirm.

I
[¶ 2] L.M. is a 43-year-old single mother of one minor child, age 10, and two adult children. In June 2005, a social worker for Cass County Social Services petitioned for the termination of parental rights to L.M.'s minor daughter, D.M. Later that month, a judicial referee ordered those rights terminated for both parents. According to the referee's findings of fact, L.M. "has struggled with mental health, chemical dependency, [and] criminal and stability issues which adversely impact her ability to parent." The referee found that D.M.'s father has had no contact with the child. D.M. has been in foster care since August 2004. The referee found clear and convincing evidence that D.M. is a deprived child and that absent termination of parental rights, deprivation is likely to continue, seriously harming the child. D.M. was placed into the custody of the Department of Human Services.
[¶ 3] In July 2006, L.M. requested a review of the referee's findings and order. On July 28, 2006, the juvenile court made its own findings, but also adopted the referee's findings of fact, conclusions of law, and order. The juvenile court terminated both parents' rights; however, only L.M. appeals.
[¶ 4] The juvenile court had jurisdiction under N.D.C.C. § 27-20-03(1)(b). The notice of appeal was not timely under N.D.C.C. § 27-20-56(1) but was timely under N.D.R.App.P. 4(a). On January 5, 2007, this Court extended the time to file the notice of appeal. See, e.g., Interest of C.R.H., 2000 ND 222, ¶ 4, 620 N.W.2d 175 ("The statutory 30-day time for appeal is not absolute and this Court can grant extensions of time for filing an appeal under the statute."). The juvenile court had jurisdiction under N.D. Sup.Ct. Admin. R. 13(11) to review the referee's findings and order. This Court has jurisdiction under N.D. Const. art. VI, §§ 2, 6, and N.D.C.C. § 27-20-56(1).

II
[¶ 5] L.M. contends the juvenile court erred when it found that the deprivation was likely to continue and that the child would suffer harm as a result of the continued deprivation.
[¶ 6] "A lower court's decision to terminate parental rights is a question of fact that will not be overturned unless the decision is clearly erroneous." Interest of M.B., 2006 ND 19, ¶ 13, 709 N.W.2d 11 (citing N.D.R.Civ.P. 52(a)). "A finding of fact is clearly erroneous if it is induced by an erroneous view of the law, if no evidence exists to support the finding, or if, on the entire record, we are left with a definite and firm conviction a mistake has been made." Interest of M.B., at ¶ 13 (citation omitted).
[¶ 7] Parental rights may be terminated if a child is deprived and the court finds the "conditions and causes of the deprivation are likely to continue or will not be remedied and that by reason thereof the child is suffering or will probably suffer serious physical, mental, moral, or emotional harm." N.D.C.C. § 27-20-44(1)(b)(1). "Clear and convincing evidence means evidence that leads to a firm belief or conviction the allegations are true." Adoption of S.R.F., 2004 ND 150, ¶ 7, 683 N.W.2d 913 (citation omitted).

A
[¶ 8] The first element of the three-part test requires a finding that the child *607 is a deprived child. N.D.C.C. § 27-20-44(1)(b). A "deprived child" is a child who:
Is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for the child's physical, mental, or emotional health, or morals, and the deprivation is not due primarily to the lack of financial means of the child's parents, guardian, or other custodian[.]
N.D.C.C. § 27-20-02(8)(a). We have defined "proper parental care" to mean the minimum standards of care that the community will tolerate. Interest of M.B., 2006 ND 19, ¶ 14, 709 N.W.2d 11 (citations omitted).
[¶ 9] According to the juvenile court findings, D.M. was found to be a deprived child on November 2, 2004, about three months after being placed in foster care. L.M. does not dispute that D.M. is a deprived child.

B
[¶ 10] L.M. contends the finding that the deprivation is likely to continue or will not be remedied is clearly erroneous.
[¶ 11] Under the second element of the three-part test, the State must prove that the deprivation is "likely to continue or will not be remedied." N.D.C.C. § 27-20-44(1)(b)(1). "To show this, the State cannot rely on past deprivation alone, but must provide prognostic evidence, demonstrating the deprivation will continue." Interest of M.B., 2006 ND 19, ¶ 16, 709 N.W.2d 11 (citing Interest of T.K., 2001 ND 127, ¶ 14, 630 N.W.2d 38).
[¶ 12] The juvenile court adopted the referee's findings, which included the following:
5. [L.M.] has struggled with mental health, chemical dependency, criminal and stability issues which adversely impact her ability to parent.
6. [D.M.] has been in foster care continuously since August 17, 2004.
7. There is a history of involvement of this family with child protection services dating back to at least 1997.
8. Active efforts have been made to reunify the child with a parent and these efforts have been exhaustive but unsuccessful.
9. [L.M.] has been unavailable to actively parent this child due to her voluntary actions, which have included, possessing controlled substances, using controlled substances, failing to maintain contact with the child and the child's temporary custodian, engaging in criminal acts which have resulted in incarceration.
10. The period of time this child would need to continue in foster care while her mother completed her obligation on her criminal conviction, established a home and a stable life in order to provide for the child cannot be predicted at this time, but will be too long to require the child to wait, taking into account the time the child has already been in foster care.
11. [D.M.] will be harmed absent a termination of parental rights.
(Emphasis added.)
[¶ 13] We "will not engage in the semantical acrobatics of guessing what is meant by a vague term never defined, explained, or elaborated upon." Interest of L.B.B., 2005 ND 220, ¶ 8, 707 N.W.2d 469. Although the judicial referee used the vague term "struggled with . . . issues" in support of its termination order, a review of the record shows sufficient evidence to support the finding that the child's deprivation will continue or will not be remedied.
*608 [¶ 14] The referee found that efforts to reunify D.M. with her mother have failed:
Active efforts were expended in attempts to reunify this child with a parent, including referrals to treatment, case management, visitation, economic assistance, parent aide services, referral to Last Chance Program (aka 220 House), Referral to Share House, Lakeland Mental Health, Chemical dependency services at Southeast Human Services, food basket referral, transportation assistance, Family Focused Services, Wrap around Funds, permanency funds, and Partnership.
[¶ 15] The referee concluded the Indian Child Welfare Act of 1978 ("I.C.W.A.") would not apply in this case:
Cass County Social Services has made repeated efforts to engage and contact the Oglala Sioux Tribe at Pine Ridge, South Dakota. Conflicting information has been received regarding the enrollment status of the child from that tribe, however, Ms. Knoll has made diligent and active effort to apprise the tribe of the situation with the child, and has not had any participation or response to her efforts. The tribe has failed to appear or assert any interest with regard to this child. At this time, based upon the testimony of Ms. Knoll, and the lack of any response or participation from the tribe, including identification of any placement for the child that would receive preference pursuant to I.C.W.A.
[¶ 16] The juvenile court also made its own findings and conclusions. It found from the petitioning social worker's testimony that L.M. had "disappeared" from May to July 2005, never visited her daughter from May 2, 2005, to August 16, 2005, and frequently missed visitation appointments. The juvenile court highlighted the fact that L.M. often did not pay any attention to D.M. when she did visit her. The court found, from the testimony of a parent aide with Cass County Social Services, that L.M. discussed inappropriate subject matter in front of the child. The social worker also testified that D.M. is "very adoptable" and is not a special-needs child. L.M. testified that she had used methamphetamine for about a year and had used alcohol for about 25 years. She also testified about her numerous DUI convictions.
[¶ 17] At the time of the trial, the juvenile court found D.M. had been in foster care for 661 days. The petitioning social worker testified that it will take another year after her release for L.M. to provide a stable environment for D.M. "When there has been an extensive period in which efforts have been made to overcome a parent's inabilities to effectively parent, the courts cannot allow the children to remain in this indeterminate status midway between foster care and the obvious need for permanent placement." Interest of B.J.K., 2005 ND 138, ¶ 16, 701 N.W.2d 924 (internal quotations and citations omitted).
[¶ 18] The juvenile court noted testimony from Dr. Ken Stone, a psychologist, who diagnosed L.M. with "a personality disorder as well as a mood disorder involving depression" and testified that "these conditions adversely affected [L.M.]'s ability to parent the child." Moreover, the court noted Dr. Stone's testimony that he "was also of the opinion that there was a higher risk of child abuse." The juvenile court found L.M. has had a "longstanding problem with alcohol" and has had "a more recent problem with methamphetamine use." Dr. Allen Broadhead, a psychiatrist who evaluates patients at the Thompkin's Rehabilitation Center, testified that L.M.'s depression has shown a marked improvement after treatment. He also testified that L.M. has had "a long history of addiction." A licensed addiction counselor testified *609 that L.M. has a dependency on alcohol and that L.M. admitted she had used marijuana and methamphetamine. According to the testimony of L.M.'s probation officer, she violated probation in July 2005 because she was convicted of possessing methamphetamine.
[¶ 19] "This Court has affirmed juvenile court judgments terminating parental rights when parents were using drugs and showed little or no signs of improving." Interest of B.J.K., 2005 ND 138, ¶ 12, 701 N.W.2d 924 (collecting cases). "[L.M.]'s history of alcohol and drug abuse with numerous failed attempts at controlling her addiction, together with evidence of [her] failure to fully cooperate with social service workers to receive the necessary treatment and services for her to become a fit parent, demonstrate a very poor prognosis for [her] ability to provide minimally adequate care for [D.M.]." See Interest of K.S. and A.S., 2002 ND 164, ¶ 23, 652 N.W.2d 341.
[¶ 20] The juvenile court reviewed L.M.'s testimony and considered her progress at the Thompkin's Rehabilitation and Recovery Center and her recent completion of parenting and anger management classes, but noted her failure to provide a sufficient plan for caring for her child:
[L.M.] testified that she plans to do everything she needs to do to regain custody of her daughter [D.M.]. Yet, she did not outline any detailed plan of what she would do when she is discharged [into] the community. She has no recent track record for employment. She has no recent track record for housing. She has no family support system or any other support system in place.
[¶ 21] The guardian ad litem representing D.M. was asked to prepare a written recommendation regarding the termination of L.M.'s parental rights:
Dr. Broadhead was impressed with [L.M.]'s . . . stated desire of what she wanted to do with her life. It is worth noting that all of these glowing reviews and reports from [L.M.]'s providers are earned while [L.M.] is under a criminal justice sentence, and not free in the community. Because [L.M.] has not been out of the criminal justice system prior to the trial, there is no evidence that [L.M.] has put the hard work and dedication she showed while at the Thompkin's Rehabilitation Center to work in her daily life beyond the prison system.
. . . .
There are just too many hurdles for [L.M.] to overcome before she would be in a position to provide a stable home for [D.M.]. It is likely that these hurdles, i.e. stable housing and employment, [and] track record of being drug and alcohol free, will take a substantial amount of time to complete. It simply is not in [D.M.]'s best interests that she continue to be held in legal limbo while [L.M.] completes her sentence, goes to the quarterhouse, and then attempts to establish herself in a stable environment in the community. Because of the length of time that [D.M.] has currently been in foster care and the uncertainty surrounding when, if ever, [L.M.] will be able to present a stable lifestyle for [D.M.], I believe it is in [D.M.]'s best interest that [L.M.]'s parental rights are terminated.
[¶ 22] "[L.M.] is to be commended for her . . . attempts to improve her life, but when the mental and physical health of a child are the concerns, it is not enough that a mother indicate a desire to improve. A parent must be able to demonstrate present capability, or capability within the near future, to be an adequate parent." *610 See Interest of M.D.K., 447 N.W.2d 318, 322 (N.D.1989).
[¶ 23] The juvenile court finding that the deprivation will continue or will not be remedied is not clearly erroneous.

C
[¶ 24] L.M. argues that the child has not suffered any real harm and that no evidence of real physical or emotional harm was presented at trial. L.M. argues that her own past behavior "was repeated over and over as the cause for concern" and that "nowhere was the prognostic evidence considered."
[¶ 25] The final element of the three-part test requires the petitioner to prove that "the child is suffering or will probably suffer serious physical, mental, moral, or emotional harm." N.D.C.C. § 27-20-44(1)(b)(1). "The risk of harm may also be shown by prognostic evidence." Interest of M.B., 2006 ND 19, ¶ 18, 709 N.W.2d 11 (citation omitted).
[¶ 26] In this case, the referee found that D.M. "will be harmed absent a termination of parental rights." The juvenile court found that D.M. was hurt emotionally when L.M. did not show up for visitation and that when she did visit D.M., she often paid little attention to the child. It found, from Dr. Stone's testimony, that D.M. is at risk of child abuse because of L.M.'s personality disorder. The juvenile court reviewed the petitioner's testimony and concluded this ordeal has been "very emotional" for D.M. The transcript reveals that D.M. has had incidents of aggression toward the other children in the foster home. In support of its finding of serious harm, the juvenile court noted a social worker's testimony that D.M. "doesn't believe her mom can take care of her." The social worker testified that she had diagnosed D.M. with an "adjustment disorder with disturbances in emotion."
[¶ 27] The juvenile court finding that the child is suffering or will probably suffer serious physical, mental, moral, or emotional harm is not clearly erroneous.

III
[¶ 28] We affirm the order adopting the judicial referee's findings and order terminating L.M.'s parental rights to D.M.
[¶ 29] GERALD W. VANDE WALLE, C.J., and DANIEL J. CROTHERS, and MARY MUEHLEN MARING, JJ., concur.
CAROL RONNING KAPSNER, J., I concur in all but paragraph 13.